128 So.2d 505

**TRI-STATE CORPORATION, INC. et al.**

v.

**STATE of Alabama ex rel. MacDonald GALLION, Attorney General.**

3 Div. 914.

Supreme Court of Alabama.

March 30, 1961.

Hamilton, Denniston, Butler & Riddick and Van Antwerp & Rector, Mobile, for appellants.

MacDonald Gallion, Atty. Gen., Willard
W. Livingston, Nicholas S. Hare, Jos. D.
Phelps and Robt. M. Hill, Jr., Asst. Attys.
Gen., for appellee.

**44**

LIVINGSTON, Chief Justice.

This is an appeal from a decree of the Circuit Court of Montgomery County, Alabama, in Equity. The original bill of complaint was filed on December 24, 1958, by appellee, the State of Alabama ex rel. John Patterson, as Attorney General of the State of Alabama.

The following are named as respondents: Robert Folsom, Individually and as Director of the Department of Conservation of the State of Alabama; James E. Folsom, Individually and as Governor of the State of Alabama; the Tri-State Corporation, Inc., an Alabama Corporation; George Trawick, a nonresident of the State of Alabama; James L. Segrest, Individually and as Chief of the Division of State Parks, Monuments, and Historical Sites of the Department of Conservation of the State of Alabama.

The bill of complaint seeks to have a lease contract by and between the State of Alabama, as lessor, and the appellant, Tri-State Corporation, Inc. (hereinafter called Tri-State), as lessee, rescinded, set aside, cancelled and held for naught. A copy of this lease and a copy of the amendment thereto are attached to and made a part of the bill of complaint as Exhibits "A" and "B." The bill of complaint further seeks to have a sublease by and between the Tri-State Corporation, Inc., as sublessor, and one George Trawick, as sublessee, covering a portion of the premises leased by the Tri-State Corporation, Inc., from the State of Alabama, rescinded, cancelled, set aside and held for naught. A copy of said sublease is attached to the bill of complaint and made a part thereof as Exhibit "D." The bill of complaint also seeks an accounting between Tri-State Corporation and the State of Alabama.

In addition to the relief sought by the bill of complaint upon final hearing of this cause, as set out above, the bill prayed that the court would issue a temporary injunction enjoining, restraining and prohibiting the respondents, their agents, servants, employees, successors in office, sublessees, subcontractors, and all other officers, employees of the State of Alabama, and all other persons in active participation with said respondents from entering into any sublease or subcontract or other agreement covering the leased premises, or any portion thereof, or performing any acts thereon in furtherance or in accordance with said agreement until further order of the court; and, second, enjoining all of said respondents below from modifying, altering or in any way changing the aforesaid lease agreements, or entering into any subsequent lease, or sublease, or subcontract covering the premises described in the aforesaid lease and sublease until the further orders of the court. The original bill of complaint is verified by John Patterson.

On the date the bill of complaint was filed, December 24, 1958, the Circuit Court of Montgomery County, Alabama, issued a temporary restraining order and injunction as prayed for in the bill of complaint.

On January 28, 1959, the respondents, Tri-State Corporation, Inc., and George Trawick filed demurrers to the bill of complaint. These demurrers were amended on May 1, 1959. On the 29th day of January, 1959, James L. Segrest filed demurrers to the bill of complaint, and on the 5th day of May, 1959, these demurrers were also amended.

On April 3, 1959, Tri-State Corporation, James L. Segrest and George Trawick filed their answer to the bill of complaint.

On May 25, 1959, by consent of the parties, MacDonald Gallion, Attorney General of the State of Alabama, was substituted as complainant for John Patterson, as Attorney General of the State of Alabama, Patterson having become the Governor of Alabama on the 19th day of January, 1959, and MacDonald Gallion having become the Attorney General of the State of Alabama on

the same date. On the same date, complainant moved the court to strike James E. Folsom and Robert Folsom, both individually and in their official capacity, as parties respondent. This motion was apparently not ruled on by the court.

On the 29th day of May, 1959, the Tri-State Corporation, James L. Segrest and George Trawick, separately and severally, moved the court to discharge the temporary injunction and also moved to dissolve said injunction issued in said cause on, to wit, December 24, 1958.

On November 12, 1959, on motion of the complainant and agreement of the parties, William C. Younger, Individually and as Director of the Department of Conservation, was substituted for Robert Folsom, Individually and as Director of the Department of Conservation; and John Patterson, Individually and as Governor of the State of Alabama, was substituted for James E. Folsom, Individually and as Governor of the State of Alabama, in the bill of complaint as parties respondent. On the same date, William C. Younger and John Patterson filed an answer accepting service of the bill of complaint and admitting the allegations thereof; consented to the temporary injunction theretofore issued in said cause, and joined in the prayer of the bill of complaint.

On November 12, 1959, the cause was submitted and heard by the trial court on the bill of complaint as amended, temporary injunction theretofore decreed by the court, the motion to discharge and motion to dissolve the injunction, motion to strike portions of the bill, amended demurrer to the bill and sworn answer of the respondents, together with sworn affidavits of the complainant and respondents.

On the 13th day of January, 1960, the court entered a decree denying the motion to discharge and the motion to dissolve the temporary injunction; granted respondents' motion to strike portions of the bill of complaint; and overruled the amended demurrers of respondents, Tri-State Corporation and George Trawick, to the bill of complaint as amended.

From this decree, Tri-State Corporation, George Trawick and James L. Segrest, the Chief of the Division of State Parks, Monuments and Historical Sites of the Department of Conservation, appealed.

First, it is insisted by appellants that Montgomery County is not the proper venue for this action.

█ If the averments of a bill in equity show on its face that it is filed in the wrong venue, a demurrer to the bill on that ground is proper practice and should be sustained. Ex parte Morton, 261 Ala. 581, 75 So.2d 500; Faulk v. Faulk, 255 Ala. 237, 51 So.2d 255; State v. Stacks, 264 Ala. 510, 88 So.2d 696; Tigrett v. Taylor, 180 Ala. 296, 60 So. 858; Hammons v. Hammons, 228 Ala. 264, 153 So. 210.

█ It is insisted by the appellants that neither Robert Folsom, as Director of the Department of Conservation, nor James E. Folsom, as Governor of the State of Alabama, are necessary parties. We cannot agree.

There are many cases in Alabama defining a necessary and indispensable party to a bill in equity. We think a few quotations from these cases to be sufficient. In Mathison v. Barnes, 245 Ala. 289, 16 So.2d 717, 719 the late Justice Bouldin quoted from the case of Hodge v. Joy, 207 Ala. 198, 92 So. 171, the following excerpts:

" 'To be a necessary and indispensable party to a bill in whose absence the court will not proceed to a final decree, one "must have a material interest in the issue which will be necessarily affected by the decree" before it will be said the court may not proceed in his absence.' * * * ' "To constitute a necessary and indispensable party to a bill, in whose absence the court will not generally proceed to a decree, he

must have a material interest in the issue which will be necessarily affected by the decree." ' * * *."

In Wilder v. Crook, 250 Ala. 424, 34 So. 2d 832, 834, we quoted from the case of First National Bank of Birmingham v. Johnson, 227 Ala. 40, 148 So. 745, as follows:

" 'It has often been held that, in order to fix the venue by the residence of a material party defendant, he must have been really interested in the suit, and that a decree against him is sought, so that his interest is in a sense antagonistic to that of complainant; in other words, a necessary rather than a merely proper party. * * *'

"See also Lewis v. Elrod, 38 Ala. 17; Harwell v. Lehman, Durr & Co., 72 Ala. 344; Gay, Hardie & Co. v. Brierfield Coal & Iron Co., 106 Ala. 615, 17 So. 618; Puckett v. Puckett, 174 Ala. 315, 56 So. 585; Ex parte Fairfield-American Nat. Bank, 223 Ala. 252, 135 So. 447."

The bill of complaint alleges that the Governor and the Director of the Department of Conservation are residents of Montgomery County. The lease agreement was executed and approved by them in their official capacity and exhibited to the bill. The Conservation Director, acting in his official capacity on behalf of the state, has continuing functions under the lease, and all of which are subject to the approval by the Governor in his official capacity. The Director of the Department of Conservation and the Governor have a continuing responsibility for state lands and as such are continuing materially interested in any disposition of state lands. To reach all parties having a continuing function under the lease contract and to maintain the status quo pending this litigation, it was necessary that the Director of Conservation and the Governor, whoever they may be, be made parties respondent. Injunctive relief is prayed for in the bill of complaint against the Director of Conservation and granted against him as such

Director of Conservation. It is clear enough, therefore, that the Director of Conservation (whoever he may be) is a material defendant within the meaning of the venue statute. It is also to be noted that the injunction order is against the office rather than merely the individual, as it binds the "successor or successors." The same reasoning supports the materiality of the Governor, whoever he may be. They would officially be parties to any lease involving state lands, and this is so regardless of the attitude of their successors.

■ We think it is well established in Alabama, as well as elsewhere, that suits involving public officials are properly maintained in the county of their official residence. First National Bank of Linden v. Alston, 231 Ala. 348, 165 So. 241; State ex rel. Toberman v. Cook, 365 Mo. 274, 281 S.W.2d 777; Eck v. State Tax Commission, 204 Md. 245, 103 A.2d 850, 859, 48 A.L.R.2d 415, Annotation, Venue, Action Against Public Official.

We have examined the authorities cited by appellants, but find that they are not apt in this proceeding. The Governor and the Conservation Director, in their official capacity, were necessary and indispensable parties to this suit. Therefore, the action was properly laid in Montgomery County.

The basis of this suit is the alleged fraud, corruption, collusion, bad faith on the part of the respondents, and a gross abuse of discretion on the part of state officials, in the execution of the two leases involved in this case. The bill alleges, in pertinent part, as follows:

"11. That the respondent, George Trawick, is an officer, director and stockholder in the respondent Tri-State Corporation, Inc.

"12. That the consideration called for in the sub-lease, as shown in Exhibit 'D,' is grossly inadequate compensation for the lease of the said premises belonging to the State of Alabama.

"13. That the leasing of the premises described in the lease agreement, Exhibit 'A' hereto, for the compensation provided in said lease is a fraud on the State of Alabama, and for the respondents, James E. Folsom, and the respondent, Robert Folsom, and respondent, James L. Segrest, to permit The Tri-State Corporation, Inc., to enter upon and take possession of said premises, at such a grossly inadequate consideration, will cause irreparable harm to the State of Alabama, for which there is no adequate remedy at law; and further, that the leasing of said property, as described in said lease, for the consideration as aforesaid, constitutes a gross abuse of discretion as reposed in the public officials named herein by the people of the State of Alabama; amounts to a breach of trust and is against the public interest; and further that respondents are acting in bad faith and that said lease agreement is fraudulent and collusive on its face.

"14. The further diminution of consideration to the State of Alabama, resulting from the sub-lease as set out in Paragraph No. 10, between the respondent, George Trawick, the said George Trawick then being an officer, director and stockholder in the said respondent corporation, manifests collusion on the part of the respondents in this cause in the entire transaction, and taints the entire transaction with fraud.

"15. Your complainant further avers that the State of Alabama has failed to receive all of the revenue that has been realized from the cutting of timber and clearing of the leased premises due to, and as a direct result of the failure and gross neglect of your respondent, James L. Segrest, Chief of the Division of State Parks, Monuments and Historical Sites of the Department of Conservation, State of Alabama, to properly supervise the sale and disposition of said timber and the clearing of said leased premises, and that such willful neglect has resulted in irreparable damage to the premises."

In pertinent part, the bill prays:

"2. That the Court will issue a temporary injunction enjoining, restraining and prohibiting the respondents, Robert Folsom, James E. Folsom, The Tri-State Corporation, Inc., James L. Segrest and George Trawick, their agents, servants, employees, successors in office, sub-lessees, sub-contractors, and all other officers and employees of the State of Alabama, and all other persons in active participation with the respondents, from entering into any sub-lease or sub-contract or other agreement covering the leased premises, or any portion thereof, or performing any acts thereon in furtherance or in accordance with said agreement until further orders of the Court.

"3. That this Court issue a temporary injunction enjoining all of the above-named respondents from modifying, altering or in any way changing the aforesaid lease agreement, or entering into any subsequent lease or sub-lease or sub-contract covering the premises described in the aforesaid lease and sub-lease, described in this complaint as Exhibit 'A,' Exhibit 'B' and Exhibit 'D'; until further orders of the Court.

"4. That upon final hearing, this Court will rescind, set aside, cancel and hold for naught the lease agreement, as amended, between the parties as set out in Paragraph No. 7, copies of which lease and amendment are attached to this Bill of Complaint and made a part hereof as Exhibits 'A' and 'B,' and cancel, set aside and rescind and hold for naught the sub-lease agreement entered into between the parties as set out in Paragraph No. 10, a copy of which is attached to this Bill of Complaint and made a part thereof as Exhibit 'D.'

"5. That this Court will proceed to ascertain the true state of accounts between the parties hereto and the true state of accounts between the respondent, The Tri-State Corporation, Inc., and the State of Alabama in reference to all money, property or other thing of value received

by or paid out by said respondent corporation from the operation and use of the leased premises, and will order such references and accounts as will ascertain the same."

The bill also prays for general relief and offers to do equity.

As stated above, the lease to Tri-State Corporation, and the amendment thereto, are attached to and made a part of the bill of complaint as Exhibits "A" and "B." Also, the lease from Tri-State to George Trawick is attached to and made a part of the bill of complaint as Exhibit "D."

The following portions of the leases involved are pertinent:

*Tri-State Lease*

"2. *Exclusive Right.* Contractor shall have the exclusive right to develop the premises and to manage and operate all businesses, concessions, facilities and activities which are established on the premises under this agreement. Such exclusive right, however, shall be in accordance with the terms, conditions and stipulations as agreed upon herein.

"3. *Articles of Sale.* Contractor shall have the right to, and will, in the course of operating its business, concessions, facilities and activities on the premises, offer for sale or sub-lease any products the sale or sub-lease of which is not prohibited by law and the sale or sub-lease of which may be appropriate in connection with the operations contemplated hereby.

"4. *Subdividing of Premises*: In the course of developing the premises, Contractor shall have the right to subdivide the premises or portions thereof and to provide and offer for sub-leasing to third parties residential building lots for the purpose of constructing thereon residences and appurtenant facilities in accordance with minimum building restrictions promulgated hereinafter. Contractor also shall have the right to provide suitable

areas for commercial use and may offer the same for sub-leasing to third parties. Contractor shall further have the right to sub-contract the operation of any businesses, concessions or activities properly conducted on the premises hereunder. All sub-leases or sub-contracts made hereunder shall be subject to any pertinent provisions hereof in the same manner as if such pertinent provisions hereof were expressly contained in such sub-leases. In the event the rights of the Contractor hereunder should be terminated and extinguished prior to the expiration of the full term hereof, then in such event the State shall replace and be substituted for the Contractor as direct landlord of any sub-leases whose sub-lease is in force at the time of such termination and extinguishment of Contractor's rights hereunder, and such sub-lease shall continue in full force and effect according to its terms as though originally entered into directly between the State and sub-lessee. No sub-lessee shall have the right to assign or sub-lease without the written consent of Contractor. No sub-lease shall be for a period of time which shall extend beyond the term of this lease.

"22. *Consideration, Payment of Fees to State.* As part of the consideration for this lease, Contractor has paid to the State simultaneously with the execution hereof the sum of Twenty-Five Thousand Dollars ($25,000.00).

"Contractor further agrees and binds itself to pay to State, as rental for the premises, the sum of money equivalent to two per cent (2%) of the gross income realized by the Contractor from revenue producing facilities, businesses, activities and buildings or other improvements located and/or operated on the premises, until such time as the State has received from Contractor at said rate of two per cent (2%) the total amount of Twenty-Five Thousand Dollars ($25,000.00); thereafter, Contractor shall pay to the State as rental for said premises the sum of money equivalent to four per

cent (4%) of said gross income. Contractor agrees to remit any amount due to the State in monthly installments on or before the 20th day of each month, the first of such installments to be due at the end of the first full calendar month occurring after the date of execution hereof. The monthly installments above stipulated shall be based on the gross income of the next immediately preceding month. 'Gross income,' as referred to in this instrument shall include all monies received for rent, fees, admissions, *subleases or services;* but in the sales of tangible merchandise the term 'gross income' shall be deemed to include only the amounts by which the sale prices exceed the actual cost of the merchandise sold. Further, the percentage payments to the State shall be figured on gross income after first excluding therefrom any monies received in the form of sales or excise taxes or ad valorem taxes and all privilege licenses or fees payable to the State of Alabama or Baldwin County shall be first deducted as an expense of doing business. Such privilege taxes shall include but not be limited to those levied on the sales or privilege of selling alcoholic beverages, tobacco and gasoline." (Emphasis added.) Amendment to Tri-State Lease.

"12. *Installations by Contractor and State.* The contractor shall have the right to construct and maintain structures, fixtures, equipment and revenue producing facilities in accordance with the Master Plan which has been approved by the Parties hereto. Such structures which are constructed by Contractor, its agents, sub-contractors or sub-lessees shall be and become the property of the State upon completion thereof, subject, however, to sub-lessee's right to occupancy during the sublease term and further subject to the provisions of paragraph 4 hereof relating to rights of sublessees. Contractor, with the written approval of the State first having been obtained, shall have the right to erect or construct additional facilities upon the premises. Contractor shall pay to the State Four Per Cent (4%) of the gross revenue received from such additional facilities which Contractor places or constructs upon the premises.

"All fixtures and equipment which are not of a permanent nature which are placed upon the premises by the Contractor, its agents, sub-contractors or sub-lessees may be removed from the premises by the Contractor, its agents, sub-contractors or sub-lessees, within sixty (60) days after the date of cancellation or termination of this contract; provided, the amount of fees which are due the State by Contractor, up to and including the date of termination, shall have been paid in full on the date of cancellation or termination or which shall be paid upon demand by the State before removal of any such fixture or equipment. All fixtures and equipment not of a permanent nature which are allowed to remain upon the premises for a period longer than sixty (60) days after the date of cancellation or termination of this contract shall be and become the property of the State and may be sold or disposed of in any manner deemed by the State to be advisable.

"The State may provide the premises with additional structures, equipment or facilities upon the written approval of the Contractor. The gross revenue derived from any additional facilities provided by the State shall be divided equally between Contractor and State. Payment to the State of its part of the revenue derived from such additional facilities shall be made at the same time and in the same manner as is provided for the regular payment of revenue to the State under the terms of this contract. It is agreed between the parties hereto that inasmuch as the leased premises is the property of the State, the improvements which are constructed upon the premises are not subject to ad valorem taxes. In the event such ad valorem taxes are, at some future time assessable, such taxes shall be paid by Contractor and deducted from the rentals which Contractor pays to the State under the terms of this agreement."

We are not unmindful of other obligations assumed by Tri-State Corporation, un-

der the terms of its lease, in the event it develops the property. But it is under no obligation to so develop, other than the $150,000, during the first five years of the lease.

The sublease agreement between Tri-State and George Trawick, covering an initial period of 25 years, contains the following:

"(3) Lessee covenants and agrees to pay the lessor, as a part of the consideration for this agreement an annual rental of *five per cent* of lessees (or any tenants under lessee) monthly gross sales during the period hereof, said percentage rental to be paid within twenty days after the end of each month. The term 'gross sales' shall mean the sales price of all merchandise of every kind sold, and the charges or rentals for all services performed or facilities furnished by the lessee or any other person or corporation selling merchandise or performing services or furnishing facilities in, upon or from any part of the demised premises, whether for cash or for credit, but shall exclude all returned merchandise accepted by seller, all allowances made by the seller to the customer, and the amounts received for Alabama Sales Taxes."

■ Much of appellants' argument that the bill lacked equity on account of its general averments of fraud, collusion, bad faith, etc., seems to be rested on a strict construction of the bill of complaint alone, without taking into consideration the exhibits attached to it. The rule is, however, that in determining the sufficiency of the allegations the recitations in the exhibits to a bill are read into and made a part of the bill. Wright v. Sadler, 255 Ala. 101, 50 So.2d 235; Autauga Co-op. Leasing Ass'n v. Ward, 250 Ala. 229, 33 So.2d 904; and when the averments of the bill are contradictory to the exhibits, the recital in the exhibits take precedence and control. Moody v. Headrick, 250 Ala. 590, 35 So.2d 489; McGowin v. Cobb, 249 Ala. 561, 32 So.2d 36; Wright v. Sadler, supra.

■ Appellants' demurrer was addressed to the bill of complaint as a whole and to its alleged several aspects. The court's decree overruling the demurrer was general, and in such case limits the review in this Court to those grounds of demurrer which are addressed to the bill as a whole. Rowe v. Rowe, 256 Ala. 491, 55 So.2d 749; Williamson v. Burks, 262 Ala. 442, 79 So.2d 42; Adams v. Woods, 263 Ala. 381, 82 So.2d 531; McCary v. Crumpton, 263 Ala. 576, 83 So.2d 309; Smith v. Wilder, 270 Ala. 637, 120 So.2d 871. The general decree overruling demurrer will be upheld by this Court on appeal if any aspect of the bill is sufficient. Authorities, supra.

As before stated, the demurrers interposed by appellants were addressed to the bill as a whole and to the several *alleged* aspects thereof.

In the recent case of Butler v. Hughes, Ala., 124 So.2d 265, 270, this Court said:

"A bill in equity should contain an 'orderly statement of the facts on which the suit is founded, without prolixity or repetition.' Equity Rule 11, Title 7, p. 1050, Code of 1940. The bill should be separated into paragraphs and numbered for convenience in answering. The numbered paragraphs, however, have no necessary relation to the causes of action presented, and no necessary relation to its aspects. An aspect is recognizable only by an analysis of the substance of the bill and by a process of mental segregation.

"One definition of an aspect found in Vol. 2 of the 1941 April Edition of The Alabama Lawyer, p. 1414, in an article written by the Honorable Earl McBee of the Birmingham Bar, reads as follows:

" 'It might then be said that an aspect of a bill is a unit thereof including a prayer for some item of relief and supporting allegations of fact, severable, but by process of analysis only, from the other relief and supporting allegations of fact contained in the bill.'

"In a later article of Vol. 2 of The Alabama Lawyer, 1941, at page 421, the late Honorable E. M. Creel, Chancellor of the Tenth Judicial Circuit, defines an aspect as follows:

" 'An aspect is a single cause of action with an appropriate prayer for relief, presented by a bill in equity.' "

 Applying the foregoing principles, we think the bill of complaint before us has no more than two aspects, one of which seeks an accounting. Clear enough, that aspect is not sufficient because no complicated accounts are alleged, and for aught appearing the complainant has an adequate remedy at law for damages. That being true, we will proceed to the other aspect which alleges fraud, corruption, collusion, bad faith on the part of respondents, and a gross abuse of discretion on the part of state officials in the execution of the lease to Tri-State. The lease from Tri-State to George Trawick must fall if the lease from the State to Tri-State is held to be invalid. The lease from Tri-State to George Trawick is but evidence of fraud, if there be fraud in the lease from the State to Tri-State.

Among other functions and duties of the Department of Conservation of the State of Alabama are the following:

"To maintain, supervise, operate and control all state forests, parks, monuments and historical sites, except Mound State Monument and the First White House of the Confederacy * * * to maintain, supervise, operate and control all state lands other than those specifically *commited* to the use or control of some other department, board, bureau, commission, agency, office or institution of the state * * * to have sole charge of all state forests and state parks and parkways and to have authority to make such rules and regulations for the management, administration, occupancy and use of said state forests and state parks and parkways, and all other property and things of whatever nature

therein or thereon, as it shall find necessary. * * * The Department of Conservation shall have full power and authority to sell, exchange, or lease land under its jurisdiction when in its judgment it is advantageous to the state to do so in the orderly development and management of state forests and state parks and parkways; provided, however, said sale, lease or exchange shall not be contrary to the terms of any contract which it has entered into."

We have recently had occasion to rule on a lease by the Conservation Department of lands belonging to the State of Alabama. In that case, we have declared the law which is applicable to the case at bar. See Finch v. State of Alabama, 271 Ala. 363, 124 So.2d 825.

If we understand correctly the position of the state, it would have us affirm the decree of the lower court on the theory that the consideration expressed in the lease is so grossly inadequate as to shock the conscience and that the inadequacy of the consideration amounts in itself to conclusive and decisive evidence of fraud. Juzan v. Toulmin, 9 Ala. 662; Mahone v. Williams, 39 Ala. 202; Cleere v. Cleere, 82 Ala. 581, 3 So. 107; Chance v. Chapman, 195 Ala. 513, 70 So. 676.

The allegations in the bill itself as to fraud, collusion, bad faith, etc., are merely conclusions of the pleader, and if we are to reach the questions of those allegations, it must be done through the exhibits, which are made a part of the bill of complaint.

The bill shows that the lease can extend for a term of 90 years, and the state is to receive 4% of the gross receipts realized by Tri-State from revenue-producing facilities, businesses, activities and buildings, or other improvements located and/or operated on the premises, including the receipts from subleases. The bill further shows that Tri-State agrees to expend, or to cause to be expended, a total amount of not less than $150,000 on permanent improvements on the premises within 5 years from and after the execution of the lease.

Tri-State is owned principally by Trawick and Baroco. Exhibit "D" to the bill shows that the consideration for the sublease from Tri-State to Trawick to be 5% of his, Trawick's, gross receipts. The sublease to Trawick includes the property on which the motel is located and is the first revenue-producing part of the property, and is, practically, the fulfillment of Tri-State's obligation to expend, or cause to be expended, the sum of $150,000. Therefore, instead of the state receiving 4% of the gross receipts on all revenue-producing property, it only receives 4% of the 5% which Tri-State receives from Trawick, thereby reducing the return to the state from 4% to ²⁄₁₀ of 1%.

The bill charges that this diminution of a consideration to the State of Alabama resulting from the sublease between Tri-State and Trawick, as an individual, and who is a stockholder and director of Tri-State, shows fraud on the part of the respondents.

The bill further shows that Tri-State has, under the terms of its lease, the right to sublease the remaining property leased by the state to it. There is nothing in the lease to Tri-State to prevent it from subleasing all, or any part, of the remaining property on any percentage basis that it may wish, and thus reduce the state's income from the property to an absurdity. Such a situation does shock the conscience of the court when taken in connection with the provisions of the lease to Tri-State to the effect that the state cannot improve its own land for 90 years without the written consent of Tri-State.

It is true that Tri-State is obligated to expend, or cause to be expended, the sum of $150,000 on the property leased by it during the first 5 years of the lease. It is not obligated to expend any other sum whatever over the next 85 years, and the state cannot improve the property without the written consent of Tri-State. We note here that approximately $150,000 has already been spent under the sublease to Trawick (the motel property) which covers just a few acres, leaving more than 2,700 acres

of the state's land which Tri-State is under no obligation to develop, and the state cannot develop it without the written consent of Tri-State for 90 years.

We have demonstrated that under the sublease to Trawick, who is a stockholder and director of Tri-State, the Tri-State Corporation would, in reality, reap the benefits of the entire transaction and the state would receive little or nothing.

It is true that the sum of $25,000 was paid in cash upon the execution of the lease, but a qualification is attached to this payment. While the lease provides that the state is to receive 4% of the gross receipts, it is provided that Tri-State would pay only 2% of the gross receipts "until such time as the state had received from Tri-State Corporation at the rate of 2% the total amount of $25,000." That, in effect, is a credit of the $25,000 on the amount the state is due to receive. Thereafter, Tri-State would pay 4% of its gross receipts. Two per cent of the 5% received from Trawick, until the total amount of $25,000 is used up, or paid back, and the 4% of the 5% the state is to receive thereafter, clearly demonstrates that Trawick is merely taking from one pocket and putting into another of his and Baroco's pockets. Just how long would be required, at the rate of ¹⁄₁₀ of 1% of the gross receipts of the motel property, to accumulate the sum of $25,000? And it is to be remembered that the expenditure requirement of $150,000 has practically already been made on the hotel property, and under the lease to Tri-State no other expenditure is compulsory. The lease to Tri-State making possible such a lease as the one to Trawick, and other subleases of like kind, or for even less returns to the state, show gross abuse of discretion on its face on the part of officials acting for the state. On demurrer, we must assume that the state officials knew the contents of the lease to Tri-State.

Fairness requires us to say that the affidavits of Trawick and Baroco, filed in support of their motion to dissolve the

temporary injunction, states that the only purpose of the sublease from Tri-State to Trawick was to secure permanent financing for the construction of the motel, and they always considered that Tri-State was the beneficial owner of the motel. It was also stated in the affidavits that a proposed second amendment to the lease between the state and Tri-State contained provisions whereby the gross income from the Gulf Lake Motel would be considered and treated as gross income of Tri-State, had been executed by Tri-State and the Director of Conservation, but had not been approved by the Governor before the injunction was issued.

We would assume that this construction of appellants would also apply with reference to any future capital improvements, whether such improvements be made by Tri-State or by others under a sublease agreement.

It is not uncommon, but indeed expedient and necessary, for percentage leases to allow the lessee to sublease, but in the absence of any explicit provisions to the contrary, the lessor's percentage of return should not be diminished through execution of subleases. We also note here that the bill offers to do equity.

But these affidavits are not before us on the ruling on demurrer. These matters may be brought before the court in the answer of respondents, or otherwise, as may be deemed expedient, but considering only the bill, its exhibits and demurrer thereto, we are convinced that the bill is factually sufficient to be good as against the demurrer interposed.

It follows that the trial court correctly overruled the demurrers and the decree is due to be affirmed.

■ We have demonstrated that the motion to discharge the injunction based on improper venire is without merit. The refusal of the motion to dissolve the injunction was within the sound discretion of the trial court. Under the facts and circum-

stances of this case, we are unwilling to say that the trial court abused its discretion.

The case is due to be, and is, affirmed.

Affirmed.

LAWSON, STAKELY and MERRILL, JJ., concur.