The STATE OF ALABAMA, on the relation of Richmond M. FLOWERS, as Attorney General of the State of Alabama, Plaintiff,

v.

Claude D. KELLEY, Individually and as Director of the Department of Conservation of the State of Alabama, George C. Wallace, Individually and as Governor of the State of Alabama, the Tri-State Corporation, Inc., an Alabama Corporation, Laurence H. Marks, Individually and as Chief of the Division of State Parks, Monuments and Historical Sites of the Department of Conservation of the State of Alabama; George Trawick, the First Bank & Trust Company of Pensacola, Florida; and United States of America, Defendants.

Civ. A. No. 1762–N.

United States District Court
M. D. Alabama, N. D.

Jan. 25, 1963.

746

Richard C. Belser, Montgomery, Ala., and Nicholas S. Hare, Mobile, Ala., Sp. Asst. Attys. Gen., of Alabama, for the State of Alabama and the State officials.

Harry H. Riddick, of Hamilton, Denniston, Butler & Riddick, Mobile, Ala., for defendants Tri-State Corp., Inc., and George Trawick.

William A. Oldacre, of Hill, Hill, Stovall & Carter, Montgomery, Ala., for defendant First Bank & Trust Co. of Pensacola, Fla.

Hartwell Davis, U. S. Atty., and Sterling G. Culpepper, Jr., Asst. U. S. Atty., Montgomery, Ala., for defendant United States.

JOHNSON, District Judge.

This action was originally filed in the Circuit Court of Montgomery County, Alabama, in December 1958, by the State of Alabama through its Attorney General. The State of Alabama seeks to have a lease agreement entered into in 1956 and amended in 1957 between the State, as lessor, and The Tri-State Corporation, as lessee,[1] rescinded, set aside, canceled and held for naught.

On the date the action was filed in the State court, the Circuit Court of Montgomery County, Alabama, issued a temporary restraining order and injunction wherein the defendants, including the Governor of the State of Alabama and the Alabama Director of the Department of Conservation—both in their representative capacities—were restrained and enjoined from entering into any sublease or subcontract or other agreement covering the lease or subleased premises, or performing any acts thereon in furtherance or in accordance with said agreement "until further order." This injunctive order was contested by Tri-State, and from a decree entered on January 13, 1960, denying a motion to discharge and dissolve the injunction and overruling a demurrer to the complaint, Tri-State appealed to the Supreme Court of Alabama. The action of the lower court was affirmed in Tri-State Corporation, Inc. et al. v. State of Alabama ex rel. Gallion, Attorney General, 272 Ala. 41, 128 So.2d 505.

There have been several changes in parties by way of amendments and substitutions.[2]

In October 1961, the case was amended —while still in the State court—to bring in as a necessary and indispensable defendant the Small Business Administration, an agency of the United States. Thereupon, after the United States of America had been substituted for the Small Business Administration as the real party in interest, and on October 18, 1961, the entire case was removed to this

1. A copy of the lease and a copy of the amendment are attached hereto as Appendices "A" and "B" respectively.

2. The final order of substitution, as authorized by Rule 25(d), Federal Rules of Civil Procedure, was entered on January 24, 1963; this order substitutes Richmond M. Flowers as Attorney General of the State of Alabama, George C. Wallace as Governor of the State of Alabama, and Claude D. Kelley as Director of the Department of Conservation of the State of Alabama.

Court pursuant to Title 28 U.S.C.A. § 1442(a) (1).

In May 1962, the case was pretried and the issues for trial were formulated. The pretrial order of this Court, made and entered herein, is attached hereto as Appendix "C."

Subsequent to the removal of the case to this Court and after the pretrial hearing, but before the trial, the United States, the State of Alabama, and The First Bank & Trust Company of Pensacola, Florida, entered into a stipulation and supplemental stipulation, the effect of which is to protect the interest of the United States and the Bank in the event the lease in question is canceled by this Court.[3]

The case was tried before this Court, sitting without a jury, in August 1962 and was submitted in October 1962 upon the pleadings, the stipulations, depositions, requests for admissions and responses thereto, interrogatories and responses thereto, the testimony of several witnesses and exhibits thereto and the briefs and arguments of the parties. Upon this submission, this Court now in this memorandum opinion and as authorized by Rule 52, Federal Rules of Civil Procedure makes the appropriate findings of fact and conclusions of law.

On September 4, 1956, W. H. ("Bill") Drinkard as the then Director of the Alabama Department of Conservation, and James L. Segrest as the then Chief of the Division of State Parks, Monuments and Historical Sites of the Alabama Department of Conservation, both executed the lease in the name of and in behalf of the State. The lease was approved on January 28, 1957, by the then Governor of the State of Alabama, James E. Folsom. This lease was amended on March 19, 1957, as is reflected by Appendix "B." By this lease, certain described lands that are a part of the Gulf State Park in Baldwin County, Alabama, consisting of approximately 2739.4 acres of land, were leased by the State of Ala-

bama to Tri-State. The property includes approximately 6758 front feet on the Gulf of Mexico and approximately 2573 acres exclusive of the land fronting on the Gulf.

The following is a summary of the pertinent provisions of the lease as amended:

*Paragraph 1* provides for lease of property to Tri-State for a primary term of fifty years, with Tri-State having an option to renew the lease for an additional period of forty years; the renewal being subject to notice and increased rental and subject to Tri-State's having substantially performed its obligations as required by the lease agreement.

*Paragraph 2* gives Tri-State exclusive right to develop and manage and operate all businesses, concessions, facilities and activities established on the premises.

*Paragraph 4* gives Tri-State the right to subdivide the premises, or portions thereof, and the right to offer for subleasing to third parties residential building lots for the purpose of constructing thereon residences and appurtenant facilities. In addition, Tri-State is given the right to provide suitable areas for commercial use "and may offer the same for subleasing to third parties." It further gives Tri-State the right to subcontract the operation of any businesses, concessions, or activities conducted on the premises.

*Paragraph 5* requires that Tri-State submit within a year from the date of lease a master plan for the proposed development of the premises. This paragraph provides certain minimum requirements and other restrictions on residential units.

*Paragraph 8* provides that Tri-State expend "or to cause to be expended" a total of not less than

---

3. A copy of the stipulation and a copy of the supplemental stipulation are attached hereto as Appendices "D" and "E" respectively.

$150,000 on permanent improvements on the premises within five years from the date of the lease, these improvements to include the construction of a motel and tourist cottages, roads and streets. This paragraph further provides that in the event Tri-State fails to expend such amount, the lease shall be terminated and Tri-State's rights shall be extinguished.

*Paragraph 9* requires that Tri-State shall keep adequate books and records and that they be available for audit by the State on demand.

*Paragraphs 10 and 11* prohibit hunting and trapping on the leased premises, establish the premises as a game sanctuary and provide that the State will have sixty days from notice to it by Tri-State within which to cut and dispose of any timber that is to be removed from the premises; the revenue from the timber is to be paid to the State.

*Paragraph 12* gives Tri-State the right to construct and maintain structures and facilities in accordance with the master plan and provides that any such structures "shall be and become the property of the State upon completion thereof, subject, however, to sub-lessee's right to occupancy during the sub-lease term," which term is authorized by Paragraph 4 supra, to run for the full lease period. This paragraph further provides that the State has a right to erect on the premises additional structures and facilities "upon the written approval" of The Tri-State Corporation, with the gross revenue derived therefrom to be divided equally between the State and Tri-State. This paragraph further provides, "It is agreed between the parties hereto that inasmuch as the leased premises is the property of the State, the improvements which are constructed upon the premises are not subject to ad valorem taxes. In the event such ad valorem taxes are, at some future time assessable,

such taxes shall be paid by Contractor and deducted from the rentals which Contractor pays to the State under the terms of this agreement."

*Paragraph 13* says that the lease shall not be assigned in whole, but may be subleased in part by Tri-State "without first obtaining the written approval of the State." This paragraph further provides that Tri-State shall at all times remain responsible to the State for the faithful performance of the terms and conditions of the lease, including the acts of its sublessees.

*Paragraph 15* authorizes the State to extinguish the lease agreement "[u]pon failure of the Contractor to substantially comply with any of the provisions, stipulations or conditions contained herein."

*Paragraph 22* sets out the consideration and fees that Tri-State is to pay the State of Alabama under the lease. Since that paragraph is critical to an understanding of the issues in this case, it is set out verbatim:

"22. CONSIDERATION, PAYMENT OF FEES TO STATE. As part of the consideration for this lease, Contractor has paid to the State simultaneously with the execution hereof the sum of Twenty-Five Thousand Dollars ($25,-000.00).

"Contractor further agrees and binds itself to pay to State, as rental for the premises, the sum of money equivalent to two per cent (2%) of the gross income realized by the Contractor from revenue producing facilities, businesses, activities and buildings or other improvements located and/or operated on the premises, until such time as the State has received from Contractor at said rate of two per cent (2%) the total amount of Twenty-Five Thousand Dollars ($25,000.00); thereafter, Contractor shall pay to

the State as rental for said premises the sum of money equivalent to four per cent (4%) of said gross income. Contractor agrees to remit any amount due to the State in monthly installments on or before the 20th day of each month, the first of such installments to be due at the end of the first full calendar month occurring after the date of execution hereof. The monthly installments above stipulated shall be based on the gross income of the next immediately preceding month. 'Gross income,' as referred to in this instrument shall include all monies received for rent, fees, admissions, sub-leases or services; but in the sales of tangible merchandise the term 'gross income' shall be deemed to include only the amounts by which the sale prices exceed the actual cost of the merchandise sold. Further, the percentage payments to the State shall be figured on gross income after first excluding therefrom any monies received in the form of sales or excise taxes or ad valorem taxes and all privilege licenses or fees payable to the State of Alabama or Baldwin County shall be first deducted as an expense of doing business. Such privilege taxes shall include but not be limited to those levied on the sales or privilege of selling alcoholic beverages, tobacco and gasoline."

The sublease to George Trawick from The Tri-State Corporation as lessor, recorded in the Office of the Judge of Probate of Baldwin County, Alabama in Book 265, page 546, et seq., was dated November 15, 1957, and leased for a term of twenty-five years to Trawick the following described property for the purpose of constructing and operating a motel:

"The West 600 feet of the SE-¼ of the SW-¼ of Section 14, T9S, R4E, between Ala. Hwy. No. 182 and Middle Lake; The East 300

feet of the West 600 feet of the SE-¼ of the SW-¼ of Sec. 14, T9S, R4E, lying South of Ala. Hwy. No. 182; and the East 300 feet of the West 600 feet of the fractional NE-¼ of the NW-¼ of Sec. 23, T9S, R4E, lying South of Alabama Hwy. No. 182."

The consideration recited in the sublease agreement to Trawick was "an annual rental of five per cent of lessees [meaning in this sublease—Trawick] monthly gross sales * * *." On March 1, 1958, The First Bank & Trust Company of Pensacola, Florida, loaned George Trawick the sum of $80,000, which sum was used in the construction of a motel on the property subleased to Trawick by Tri-State. The Bank then assigned 90% of that indebtedness to the United States of America, acting by and through the Small Business Administration, an agency of the United States of America, but retained a participation interest of 10% in said indebtedness. Therefore, in effect, the United States loaned Trawick $72,000 and The First Bank & Trust Company of Pensacola, Florida, loaned him $8,000. As security for this indebtedness, Trawick pledged, assigned, mortgaged and hypothecated the lease he received from Tri-State and also mortgaged all buildings and improvements that were erected on the property. In this connection, this Court specifically finds that neither the United States of America, acting by and through the Small Business Administration, nor The First Bank & Trust Company of Pensacola, Florida, had any knowledge, actual or constructive, that the lease between the State of Alabama and The Tri-State Corporation, Inc., was void or invalid.

The theory of the State, in seeking to have the lease and the sublease declared void, is that the compensation provided for in the lease is inadequate to the extent that it operates as a fraud on the State of Alabama; that the consideration provided for, or that can be expected under the provisions of said lease, is grossly inadequate; that said action of leasing

the premises constitutes gross abuse of discretion on the part of the public officials and a breach of trust on the part of said officials; and that said conduct operated, and continues to operate, against the public interest. In seeking cancellation of the lease and sublease, pursuant to the stipulation hereinabove referred to, the State of Alabama offers to do equity in the event the contract and subcontract are canceled and declared void insofar as the United States and The First Bank & Trust Company of Pensacola, Florida, are concerned. In the event said lease is canceled, the State of Alabama further offers to do equity as to any improvements or expenditures by The Tri-State Corporation and its lessee, George Trawick. It has been stipulated and agreed by all concerned that in the event the lease is canceled, these equities are to be determined by the Court.

To these contentions, Tri-State and Trawick say that there was no fraud, inadequate consideration, or abuse of discretion. These defendants further say that if the lease is to be construed so as to provide for a diminution or reduction in rent in the event of a sublease, then such provision was the result of a mutual mistake of fact by the parties and the lease should be reformed so as to eliminate the provision or provisions resulting in such construction. These defendants further contend that if this Court declares the lease and sublease to be invalid, they are, in that event, entitled to restitution for their reasonable expenditures in and about the improvement of the leased premises. The defendants further contend that the State of Alabama is estopped from questioning the validity of the lease by reason of the delay in presenting the matter to a court and by reason of the large expenditures incurred by the defendants during such a delay.

█ █ It is generally conceded by all the parties to this case that the Legislature of the State of Alabama has the power to authorize the leasing of State property, the length of the term for which leases may be made, and the gen-eral policy relating to such leases. There is no question but that the Legislature had conferred on the Director of Conservation for the State of Alabama the right to lease the property here involved. Sections 3 and 6, Title 8, Code of Alabama, Recompiled 1958; Act 341, approved July 1945; General Acts, 1945, page 554.

█ It is further generally conceded by all the parties to this action that this Court has the right to vacate a State contract which was the result of actual fraud. McGehee v. Lindsay, 6 Ala. 16; Finch v. State of Alabama, 271 Ala. 499, 124 So.2d 825. In the case now before this Court, there is no direct evidence of actual fraud on the part of any person connected with the execution of the lease, the amendment thereto, or the sublease. However, the law is clear to the effect that courts can and should intervene for the protection of the public in instances where there is fraud, corruption, or bad faith—the equivalent of fraud. Van Antwerp v. Board of Commissioners of City of Mobile, 217 Ala. 201, 115 So. 239; Finch v. State of Alabama, supra; and Tri-State Corporation, Inc. v. State of Alabama, supra.

The evidence in this case necessitates the finding that the lease from the State of Alabama to Tri-State evidences, on its face, a gross abuse of discretion on the part of the officials acting for the State. The evidence further necessitates this Court's finding that the officials of Tri-State, including Trawick, knew and understood the conditions of the lease in question. The evidence in the case further necessitates this Court's finding that the consideration expressed in the lease in question is so grossly inadequate as to shock the conscience, and the inadequacy of the consideration amounts, in itself, to decisive evidence of fraud. In this connection, the evidence is abundant. For instance, the leased property, consisting of 2739.4 acres, had at the time of the execution of the lease from the State of Alabama to Tri-State a fair market value in excess of $1,000,000. The chief engineer for the State of Ala-

bama Conservation Department during the time of the negotiations for, and the execution of, the lease to Tri-State, did not approve the "master plan" of the proposed development on the leased area. Subsequent to the execution of the lease and upon a formal presentation of the master plan, the chief engineer made known his opposition to such a plan. Also subsequent to the execution of the lease, there was cut and removed from the leased premises by The Tri-State Corporation, or its agents, over 300,000 board feet of timber; this timber had a reasonable market value of approximately $10,000. The total amount paid to the State of Alabama for this timber that was cut and removed was $3,421.40. This, of course, was a violation of the provisions of the lease. However, until this litigation was filed, the State of Alabama took no steps to supervise the cutting of the timber or to determine who received the money for the timber that was cut from this State property. The books and records as kept and maintained by The Tri-State Corporation and as required by the lease were inadequate and incomplete. As far as the evidence in this case reflects, the State of Alabama made no effort to examine these books and records until this litigation was filed.

The Supreme Court for the State of Alabama, in analyzing this lease when it was presented to that Court by Tri-State in its efforts to have the temporary injunction dissolved, reviewed the law applicable in cases such as this one. Of course, what the Supreme Court of Alabama said in Tri-State Corporation, Inc. v. State, supra, was upon the assumption that the State of Alabama could prove the allegations of its complaint. This Court finds that the State of Alabama did prove the allegations of its complaint; therefore, the language used by the Supreme Court of the State of Alabama in Tri-State Corporation, Inc. v. State, in analyzing the lease in question, is extremely important. The Court there said:

"If we understand correctly the position of the state, it would have us affirm the decree of the lower court on the theory that the consideration expressed in the lease is so grossly inadequate as to shock the conscience and that the inadequacy of the consideration amounts in itself to conclusive and decisive evidence of fraud. Juzan v. Toulmin, 9 Ala. 662; Mahone v. Williams, 39 Ala. 202; Cleere v. Cleere, 82 Ala. 581, 3 So. 107; Chance v. Chapman, 195 Ala. 513, 70 So. 676.

"The allegations in the bill itself as to fraud, collusion, bad faith, etc., are merely conclusions of the pleader, and if we are to reach the questions of those allegations, it must be done through the exhibits, which are made a part of the bill of complaint.

"The bill shows that the lease can extend for a term of 90 years, and the state is to receive 4% of the gross receipts realized by Tri-State from revenue-producing facilities, businesses, activities and buildings, or other improvements located and/or operated on the premises, including the receipts from subleases. The bill further shows that Tri-State agrees to expend, or to cause to be expended, a total amount of not less than $150,000 on permanent improvements on the premises within 5 years from and after the execution of the lease.

"Tri-State is owned principally by Trawick and Baroco. Exhibit 'D' to the bill shows that the consideration for the sublease from Tri-State to Trawick to be 5% of his, Trawick's, gross receipts. The sublease to Trawick includes the property on which the motel is located and is the first revenue-producing part of the property, and is, practically, the fulfillment of Tri-State's obligation to expend, or cause to be expended, the sum of $150,000. Therefore, instead of the state receiving 4% of

the gross receipts on all revenue-producing property, it only receives 4% of the 5% which Tri-State receives from Trawick, thereby reducing the return to the state from 4% to ⅖₀ of 1%.

"The bill charges that this diminution of a consideration to the State of Alabama resulting from the sublease between Tri-State and Trawick, as an individual, and who is a stockholder and director of Tri-State, shows fraud on the part of the respondents.

"The bill further shows that Tri-State has, under the terms of its lease, the right to sublease the remaining property leased by the state to it. There is nothing in the lease to Tri-State to prevent it from subleasing all, or any part, of the remaining property on any percentage basis that it may wish, and thus reduce the state's income from the property to an absurdity. Such a situation does shock the conscience of the court when taken in connection with the provisions of the lease to Tri-State to the effect that the state cannot improve its own land for 90 years without the written consent of Tri-State.

"It is true that Tri-State is obligated to expend, or cause to be expended, the sum of $150,000 on the property leased by it during the first 5 years of the lease. It is not obligated to expend any other sum whatever over the next 85 years, and the state cannot improve the property without the written consent of Tri-State. We note here that approximately $150,000 has already been spent under the sublease to Trawick (the motel property) which covers just a few acres, leaving more than 2,700 acres of the state's land which Tri-State is under no obligation to develop, and the state cannot develop it without the written consent of Tri-State for 90 years.

"We have demonstrated that under the sublease to Trawick, who is a stockholder and director of Tri-State, the Tri-State Corporation would, in reality, reap the benefits of the entire transaction and the state would receive little or nothing.

"It is true that the sum of $25,000 was paid in cash upon the execution of the lease, but a qualification is attached to this payment. While the lease provides that the state is to receive 4% of the gross receipts, it is provided that Tri-State would pay only 2% of the gross receipts 'until such time as the state had received from Tri-State Corporation at the rate of 2% the total amount of $25,000.' That, in effect, is a credit of the $25,000 on the amount the state is due to receive. Thereafter, Tri-State would pay 4% of its gross receipts. Two per cent of the 5% received from Trawick, until the total amount of $25,000 is used up, or paid back, and the 4% of the 5% the state is to receive thereafter, clearly demonstrates that Trawick is merely taking from one pocket and putting into another of his and Baroco's pockets. Just how long would be required, at the rate ⅒ of 1% of the gross receipts of the motel property, to accumulate the sum of $25,000? And it is to be remembered that the expenditure requirement of $150,000 has practically already been made on the hotel property, and under the lease to Tri-State no other expenditure is compulsory. The lease to Tri-State making possible such a lease as the one to Trawick, and other subleases of like kind, or for even less returns to the state, show gross abuse of discretion on its face on the part of officials acting for the state. On demurrer, we must assume that the state officials knew the contents of the lease to Tri-State."

The attempt on the part of Tri-State to save this lease by asking this Court

(if this Court construes the lease so as to provide for diminution of rents in the event of a sublease—and this Court does so construe it) to reform the lease so as to eliminate the "diminution or reduction in rent" provision, must fail. There is no evidence in this case that the Governor of the State of Alabama, who authorized and approved this lease, considered the diminution clause a mutual mistake. As a matter of fact, plaintiff, in response to certain requests for admissions, denied that there was a mutual mistake on the part of the State officials. This Court now specifically finds that it was the intent of the parties that the State of Alabama was to receive from The Tri-State Corporation only a percentage of the income realized by Tri-State. To put it another way, as to the percentage of income the State was to receive under this lease, there was no intent different from the express provisions of the written lease and therefore there was no "mutual mistake" that requires or even justifies a reformation of the lease. Brumfield v. Hall, 215 Ala. 515, 110 So. 898; Grove v. Robertson, 255 Ala. 346, 51 So.2d 528. Thus, it is very readily apparent that the lease as written and as intended to the extent that it provides that the State of Alabama is to receive a "percentage of a percentage" of the income received by The Tri-State Corporation, makes it possible (and from the lease of the motel property from Tri-State to Trawick, likely) that the State's income from the leased property will be reduced to an absurdity.

There is no question but that a court of competent jurisdiction has the power to reform a lease. Sunshine Grain Co. v. United States Fidelity & Guaranty Co. et al. (5th Cir., 1959), 270 F.2d 777. See also Title 9, § 59, and Title 47, § 136, Code of Alabama, Recompiled 1958. However, for the reason already set out, the theory of reformation is not here applicable. In addition, this Court further finds and concludes that a reformation of the diminution clause would not cure another part of the lease which is shocking to the conscience of the Court;

that is, that portion of the lease making it necessary for the State of Alabama to secure Tri-State's written consent before the State could make any improvements on any portion of the 2739.4 acres of land covered by the lease agreement. The development of this property as proposed by Tri-State's master plan and as indicated by the "improvements" made on the property by Tri-State, its agents and sublessee, could have effectively excluded any beneficial use and enjoyment of this property by the general public for a term of ninety years. Nor would reformation correct that feature of the lease which evidences a gross abuse of public trust by attemping to agree that if The Tri-State Corporation pays any ad valorem taxes at all, it may reduce its rental payments by that amount. In this connection, see § 211, Constitution of Alabama 1901; State v. Alabama Power Company, 254 Ala. 327, 48 So.2d 445, and Attorney General's Opinion, Vol. 90, Quarterly Report, page 10. As to the request by Tri-State and Trawick that this Court reform that part of the lease relating to diminution in rents in the event of subleases, this Court finds specifically, first, that there was no mutual mistake; second, that the party aggrieved was the State of Alabama and the State of Alabama is not seeking reformation; and, third, that reformation of that feature of the lease alone would not save the lease in that the other two features, just referred to above, reflect that the action of leasing the premises involved constitutes a gross abuse of discretion on the part of the public officials who executed the lease for the State and a breach of trust on the part of said officials who were acting, presumably, in the public interest.

As to Tri-State's contention that the State of Alabama is now estopped to take the position that the transaction was fraudulent, this Court finds that no facts have been shown in this case which would justify or require the invocation of this doctrine. In any event, estoppel does not apply to the government or governmental agencies. County Board of Ed-

ucation of Coffee County v. City of Elba, 273 Ala. 151, 135 So.2d 812, and the cases therein cited.

■ Finally, in making an application of the facts disclosed by the evidence in this case to the law as set out in Tri-State v. State, supra, this Court must conclude that the lease in question and, of necessity, the sublease from Tri-State to Trawick are void because of fraud that is to be inferred from all the facts and circumstances surrounding the transactions and because of the gross abuse of discretion on the part of public officials that is so apparent from these same facts and circumstances.

■ As to the equities of the various parties in this case, this Court finds that the reasonable value of the improvements on and to the leased property by The Tri-State Corporation computed on the basis of cost, less depreciation, and excluding the property upon which the motel is located, which property was subleased by Tri-State to Trawick, is $25,-000. This includes the four cottages, the sand dune leveling, the fertilizing, and all other improvements on the leased premises by Tri-State, its agents and/or sublessees. This Court further finds that the work on the golf course was without cost to The Tri-State Corporation, said work having been done by the Deep South Construction Company, Inc., by reason of an oral agreement with The Tri-State Corporation in exchange for an agreement on the part of Tri-State that Deep South was to receive a one-half interest in the motel property and a one-half interest in the golf course. This Court further finds that the leased premises were not improved in value by reason of the golf course construction work. As to the interest of the United States of America, acting by and through the Small Business Administration, and The First Bank & Trust Company of Pensacola, Florida, as opposed to the interest of the State of Alabama, this Court finds that it would be unfair, unjust and inequitable for the State of Alabama to retain the valuable improvements and benefits arising and existing as a result of the $80,000 loan without making restitution and placing the United States of America and the Bank in the position they were in before the making of said loan by which said valuable improvements were constructed on the leased premises. By reason of the enhancement of the value of the leased premises with the proceeds of said loan and as a condition precedent to the leased property reverting to the State of Alabama without said property being encumbered by this ninety-year lease, the State of Alabama will be ordered and directed by this Court, pursuant to the stipulation made and filed herein on the 19th day of April, 1962, by and between the United States of America, the Bank and the State of Alabama, to convey in fee simple to the Small Business Administration, an agency of the United States Government, its successors and assigns, for its use and benefit and the use and benefit of the United States of America and The First Bank & Trust Company of Pensacola, Florida, the real estate described in the lease agreement between The Tri-State Corporation and George Trawick, said lease agreement being recorded in the Office of the Judge of Probate of Baldwin County, Alabama, on the 2nd day of June, 1958, in Book 265, pages 546–551, together with all buildings and improvements located on said described real estate, the conveyance of said property by the State of Alabama to be on the condition that all of said described property, together with all the buildings and improvements located thereon, will be sold at its market value by the Small Business Administration, its successors or assigns, within a period of time not exceeding two years from the date of this order. The sale of said property by the United States of America, acting through the Small Business Administration, shall be subject to the approval of this Court, and the proceeds of said sale shall be used, first, to discharge the obligation to the United States of America, said obligation growing out of the loan from the United States of America, acting through the Small Business Administration, to

George Trawick, and said loan being secured by a mortgage on the property described in the lease agreement between The Tri-State Corporation and George Trawick as hereinabove described; second, to discharge the obligation due The First Bank & Trust Company of Pensacola, Florida, under its participation agreement with the United States of America, acting through the Small Business Administration; and, third, to pay the reasonable expenses in connection with the sale and conveyance of said property, including but not limited to recent repairs or maintenance. The balance from the sale of said property, if any, shall be paid into the registry fund of this Court so that this Court may at that time make a determination concerning the remaining equities between the State of Alabama and The Tri-State Corporation.

A formal order will be entered accordingly.

## APPENDIX "A"

"STATE OF ALABAMA⎱ LEASE
"BALDWIN COUNTY ⎰ AGREEMENT

"KNOW ALL MEN BY THESE PRESENTS: That this agreement, made and entered into by and between the STATE OF ALABAMA, acting by and through the DIRECTOR OF CONSERVATION and the CHIEF of the DIVISION OF STATE PARKS, MONUMENTS AND HISTORICAL SITES, Party of the First Part, hereinafter referred to as STATE, and THE TRI-STATE CORPORATION, INC., an Alabama Corporation, Party of the Second Part, hereinafter referred to as CONTRACTOR, in consideration of the terms, conditions and covenants herein contained and the promises hereinafter stipulated, the said parties hereto mutually covenant and agree as follows:

"1. *GRANT OF LEASE.* The State does hereby grant, lease and let unto the Contractor the following described real property situated in Baldwin County, Alabama, to-wit:

"*PARCEL A:* That part of Gulf State Park which is located and situated within Sec. 10, T9S, R4E, less and except that portion of said Sec. 10 which lies south of the paved road running east and west through Gulf State Park, and west of the dividing line between SW4 of SE4 and SE4 of SE4 of said Sec. 10; *also,* that part of Gulf State Park which is located and situated easterly of the east shoreline of Big Lake within the east half of Sec. 15, T9S, R4E; *also,* that part of Gulf State Park which is located and situated within the east half of Sec. 22, T9S, R4E; *also,* that part of Gulf State Park which is located and situated within Secs. 11, 14 & 23, T9S, R4E; *also,* that part of Gulf State Park which is located and situated within the west half of Secs. 12 & 13, T9S, R4E; *also,* that part of Gulf State Park which is located and situated within the East Half of Sections 12 & 13, T9S, R4E; *also,* that part of Gulf State Park which is located and situated within the West Half of Sec. 7, T9S, R4E;

"*PARCEL B:* That part of Gulf State Park described as beginning at the half-mile post on the west line of Sec. 8, T9S, R4E, and run thence south along said west line of said Sec. 8 to the point where the south line of Gulf State Park intersects said west section line and run thence east along said south line of Gulf State Park and along an eastwardly extension of said south line to the point where such extension of said south line intersects the north shore of Cotton Bayou at the line of mean low water, and run thence with the meanders of the north shore of Cotton Bayou eastwardly along the said line of mean low water to the point where said line of mean low water is intersected by the east line of Gulf State Park, thence run north along said east line of Gulf State Park to a point lying due east of

the half-mile post on the east line of Sec. 8, T9S, R4E, thence run west to said half-mile post and continue thence west to the point of beginning;

"All of the aforementioned and described real property being a part of what is known as Gulf State Park in T9S, R4E, Baldwin County, Alabama, subject to any existing rights of way of streets, roads, and utility lines or facilities; together with any improvements presently thereon or which may be constructed or erected thereon during the term of this lease;

hereinafter referred to as the 'Premises,' for a term of fifty (50) years from and after the date of execution hereof; provided, that the Contractor shall have the option to renew this lease for an additional period of forty (40) years from and after the date of expiration of the primary term hereof, said option to be subject to the following conditions:

"(a) that the duties, obligations and covenants herein undertaken by Contractor shall have been substantially performed and carried out; (b) that Contractor give to the State at least ninety (90) days notice in writing of its intention to exercise said option; (c) that Contractor pay to the State during such additional period of forty (40) years as rental for the premises one per cent (1%) of the gross income realized from revenue producing facilities on the premises, said one per cent (1%) of said gross income to be in addition to any sums hereinafter provided to be paid by Contractor to the State during the primary term hereof, it being the intention of the parties that during the contemplated renewal period, should Contractor exercise its option hereby granted, Contractor shall pay a total of the payments provided hereinafter for the primary term plus the said one per cent (1%) hereinabove mentioned.

"2. EXCLUSIVE RIGHT. Contractor shall have the exclusive right to develop the premises and to manage and operate all businesses, concessions, facilities and activities which are established on the premises under this agreement. Such exclusive right, however, shall be in accordance with the terms, conditions and stipulations as agreed upon herein.

"3. ARTICLES OF SALE. Contractor shall have the right to, and will, in the course of operating its business, concessions, facilities and activities on the premises, offer for sale or sub-lease any products the sale or sub-lease of which is not prohibited by law and the sale or sub-lease of which may be appropriate in connection with the operations contemplated hereby.

"4. SUB-DIVIDING OF PREMISES. In the course of developing the premises, Contractor shall have the right to subdivide the premises or portions thereof and to provide and offer for subleasing to third parties residential building lots for the purpose of constructing thereon residences and appurtenant facilities in accordance with minimum building restrictions promulgated hereinafter. Contractor also shall have the right to provide suitable areas for commercial use and may offer the same for sub-leasing to third parties. Contractor shall further have the right to sub-contract the operation of any businesses, concessions or activities properly conducted on the premises hereunder. All sub-leases or sub-contracts made hereunder shall be subject to any pertinent provisions hereof in the same manner as if such pertinent provisions hereof were expressly contained in such sub-leases. In the event the rights of the Contractor hereunder should be terminated and extinguished prior to the expiration of the full term hereof, then in such event the State shall replace and be substituted for the Contractor as direct landlord of any sub-leasee whose sub-lease is in force at the time of such termination and extinguishment of Contractor's rights hereunder, and such sub-lease shall continue in full force and effect according to its terms as though originally entered into directly between the State and sub-lessee. No sub-lessee shall have the right to as-

sign or sub-lease without the written consent of Contractor. No sub-lease shall be for a period of time which shall extend beyond the term of this lease.

"5. *MASTER PLAN—BUILDING RESTRICTIONS.* The Contractor shall submit to the State within one year from the date of execution hereof a Master Plan for the proposed development by Contractor of the premises and, upon approval by the State of such Master Plan, said Plan shall not thereafter be altered or substantially deviated from by Contractor in the course of development of the premises without prior mutual consent of the parties hereto. No residential unit shall be constructed on the premises unless the covered living area, exclusive of open or screened porches and entrance stoops, shall consist of an area of 500 square feet or more. Separate buildings for garage or servant quarters use may be constructed in conjunction with residential units, provided such separate buildings are in substantial architectural conformity with the units to which they are adjuncts. No outdoor privies shall be constructed on the premises.

"6. *PRICES.* Contractor shall have the right to make a reasonable charge to patrons of and visitors to the said premises for food, beverages, refreshments, souvenirs, novelties, rides, games, playground equipment and services which Contractor makes available to said patrons and visitors. Such prices shall be in line with prices charged for similar products and facilities in analogous businesses in this State or in other cities or states. Contractor shall have the exclusive right to sell beer and other alcoholic beverages upon the leased premises provided that Contractor or its sub-contractors or sub-lessees shall have been first duly licensed by the Alabama Alcoholic Beverage Control Board to engage in such business. It is agreed and understood by and between the parties hereto that the sale of such alcoholic beverages shall be at a maximum price not inconsistent with prices set by the Alabama Alcoholic Beverage Control Board. Con-

tractor agrees substantially to abide by all the laws of the State of Alabama, of the Federal Government and regulations of the Alabama Alcoholic Beverage Control Board as regarding the handling of alcoholic beverages upon the premises. Contractor further agrees that no beverages will be dispensed in glass containers except within properly licensed premises.

"7. *WATER AND ELECTRICITY.* Contractor agrees to provide its commercial facilities with water for drinking and other purposes. Contractor agrees to provide the premises with such electrical current as may be necessary for the operation of the businesses, concessions, facilities and activities which are established on the premises under this agreement. It is expressly understood that the State shall not in anywise be required to furnish any water, electricity or other utility services or facilities whatsoever.

"8. *PERMANENT IMPROVEMENTS.* Contractor agrees to expend or to cause to be expended a total amount of not less than One Hundred Fifty Thousand Dollars ($150,000.00) on permanent improvements on the premises within five (5) years from and after the execution hereof. Such improvements shall include but not be limited to the construction of a motel and tourist cottages, subdivision of property, construction of roads and streets and such other improvements as may be deemed necessary by the Contractor to the development of the premises. In the event Contractor fails to expend or cause to be expended the total amount of One Hundred Fifty Thousand Dollars ($150,000.00) on the above facilities and buildings, the rights of Contractor under this contract shall immediately be terminated and extinguished. If, however, at the expiration of said period of time, the said buildings, appurtenances and facilities are in the process of construction, the State agrees to waive the termination and extinguishment of Contractor's rights hereunder for such cause and Contractor will be allowed a reasonable length of time there-

after to expend or cause to be expended the full amount for such construction as herein specified.

"9. BOOKKEEPING AND AUDITING. Contractor shall install and keep a standard set of books showing all receipts and disbursements relating to the businesses, concessions, facilities and activities which are operated on the premises hereunder. Contractor shall submit said books to the State on demand for an annual audit. Said books shall be open and available at all reasonable times for inspection by properly and authorized officials of the State, and the State, at its option and at its own expense, may have an accounting in writing at each time the monthly installments above stipulated are due.

"10. HUNTING OR TRAPPING IN AREA PROHIBITED. Contractor agrees that hunting or trapping will be prohibited within the leased area and that it will post appropriate signs and give notices to all sub-lessees, sub-contractors and their guests that the leased area is a game and wildlife sanctuary and that it shall be unlawful to hunt, trap, pursue, catch or kill any wild bird or wild animal within the leased area.

"11. TIMBER TO BE CUT BY STATE. Contractor agrees that on any areas to be filled or cleared, the State will be given notice so that it may dispose of any timber growing upon such areas. The merchantable timber shall be cut by State within sixty (60) days after such notice is given to it by Contractor. Any timber remaining upon the areas to be filled or cleared after the sixty (60) day notice period has expired may be disposed of by Contractor; however, any revenue realized by Contractor in such disposal must be paid to the State.

"12. INSTALLATIONS BY CONTRACTOR AND STATE. The Contractor shall have the right to construct and maintain structures, fixtures, equipment and revenue producing facilities in accordance with the Master Plan which has been approved by the parties hereto. Such structures which are constructed by Contractor, its agents, sub-contractors or sub-lessees shall be and become the property of the State upon completion thereof, subject, however, to sub-lessees right to occupancy during the sub-lease term and further subject to the provisions of Paragraph 4 hereof relating to rights of sub-lessees.

"All fixtures and equipment which are not of a permanent nature which are placed upon the premises by the Contractor, its agents, sub-contractors or sub-lessees may be removed from the premises by the Contractor, its agents, sub-contractors or sub-lessees, within sixty (60) days after the date of cancellation or termination of this contract; provided the amount of fees which are due the State by Contractor, up to and including the date of termination, shall have been paid in full on the date of cancellation or termination or which shall be paid upon demand by the State before removal of any such fixture or equipment. All fixtures and equipment not of a permanent nature which are allowed to remain upon the premises for a period longer than sixty (60) days after the date of cancellation or termination of this contract shall be and become the property of the State and may be sold or disposed of in any manner deemed by the State to be advisable.

"The State may provide the premises with additional structures, equipment or facilities upon the written approval of the Contractor. Contractor shall pay to the State four per cent (4%) of the gross revenue received from such additional facilities which it places or constructs upon the premises. The gross revenue derived from any additional facilities provided by the State shall be divided equally between Contractor and State. Payment to the State of its part of the revenue derived from such additional facilities shall be made at the same time and in the same manner as is provided for the regular payment of revenue to the State under the terms of this contract. It is agreed between the parties hereto that inasmuch as the leased premises is the property of the State, the im-

provements which are constructed upon the premises are not subject to ad valorem taxes. In the event such ad valorem taxes, are, at some future time assessable, such taxes shall be paid by Contractor and deducted from the rentals which Contractor pays to the State under the terms of this agreement.

"13. *NON-ASSIGNABLE*. This agreement shall not be assigned in whole but may be sub-contracted and/or sub-leased in part by Contractor without first obtaining the written approval of the State as herein provided for. If there shall be any unauthorized assignment by the Contractor, all rights of Contractor under this contract shall be terminated and extinguished without notice and the provisions of Paragraph 4 relating to sub-lessees shall immediately become operative. Provided, however, the Contractor shall at all times remain responsible to the State for the faithful performance of the terms and conditions of this contract including the acts of its sub-contractors and/or sub-lessees.

"14. *STATE AND FEDERAL LAWS APPLICABLE*. Contractor agrees, and it is expressly understood, that any structures, businesses, concessions, facilities and activities built and/or operated on the premises by the Contractor shall not constitute a violation of Federal, State or Local Laws.

"15. *CANCELLATION*. Upon failure of the Contractor to substantially comply with any of the provisions, stipulations or conditions contained herein, the rights of Contractor under this contract may be terminated and extinguished at the option of the State. In the event of the cancellation or termination of Contractor's rights under this contract as herein provided, the amount of the fees which may be due to the State from the Contractor under Paragraph 22 hereof, up to and including the termination date, shall become immediately due and shall be paid by the Contractor. In the event Contractor fails to substantially comply with any of the provisions, stipulations or conditions contained herein, before the State exercises its option

to cancel Contractor's rights under this agreement, Contractor will be given sixty (60) days notice in writing in which to correct or rectify its failure to so comply. If such failure is corrected or rectified within sixty (60) days after receipt of such written notice, the State shall not exercise its option to terminate.

"16. *LAND FILLS*. Contractor shall have the right and privilege to construct land fills, either hydraulic or otherwise, in the waters within the leased premises, as provided for in the Master Plan above referred to; however, same must be first approved by the U. S. Corps of Engineers when such approval is necessary. Contractor shall not be required to pay the State for any material which Contractor dredges in making such land fills.

"17. *SANITATION*. Contractor agrees to keep the premises, including all buildings erected thereon, in a reasonably clean and sanitary condition at all times, and at its own expense, Contractor shall obtain such help and labor as may be necessary to accomplish that end. Should the Contractor fail to keep the premises in a reasonably clean and sanitary condition as specified herein, the State may notify the Contractor in writing of such failure, and should the Contractor fail substantially to correct or rectify the objectionable condition within ten (10) days from the date of receipt of such written notice from the State, then the State may, at its option, correct such conditions, or cause the same to be corrected, and the Contractor shall be obligated to pay all reasonable costs incurred by the State in taking such corrective action.

"18. *'PREMISES' DEFINED*. The word 'premises,' herein used, shall be construed to mean the realty and all structures or improvements thereon.

"19. *USE OF PREMISES AND EQUIPMENT*. Contractor shall not permit or suffer any offensive use of the premises or permit or suffer the commission of injury or damage to the premises or any permanent structure erected thereon. Contractor agrees to maintain

or cause to be maintained the permanent structures in a good state of repair and to maintain or cause to be maintained all rides, games and playground equipment in a reasonable state of repair and safety. Contractor further agrees to make frequent periodic inspections of all rides and playground equipment and will allow the State, through any of its authorized agents or employees, to make such inspection as it shall deem necessary. Contractor further agrees to repair or cause to be repaired any of said equipment which it or the State, from such inspections, deems advisable and to discard any such equipment which is deemed by it or the State to be in such a poor condition that same could not be repaired or restored to a safe and useable condition.

"20. INSURANCE ON PERMANENT BUILDINGS. Contractor agrees to carry or cause to be carried fire and windstorm insurance on all structures or buildings of a permanent nature which are constructed or erected on the premises in an amount not less than the full insurable value thereof. In the event any of the buildings which are covered by insurance are damaged or destroyed by fire or wind, repair or reconstructions shall be begun by Contractor as soon as practicable after the insurance claim has been paid. Contractor may, for its own protction and at its own expense, insure the contents of said buildings. All sub-lessees shall be required to carry fire and windstorm insurance on buildings which they construct upon the premises in an amount not less than the full insurable value thereof and in the event any of such buildings are damaged or destroyed by fire or wind, they shall be required to be repaired or replaced as soon as practicable after the insurance claim has been paid. Sub-lessees may, for their own protection, insure the contents of such buildings.

"21. LIABILITY INSURANCE AND SURETY BOND. The Contractor binds itself to carry a landlord's liability policy at all times during the term of this agreement, particularly on the life and limb in favor of patrons using the premises, in the usual form of such policies, indemnifying said patrons and the State from any legal fault or negligence on the part of the Contractor, its agents and employees and/or its sub-contractors and sub-lessees in the operation of said premises, from which said patrons may suffer injury or death, and for which there is a legal liability, for any damages suffered by patrons and the public in general while on the leased area. This insurance shall be written by one or more companies qualified to do business in Alabama and shall provide a coverage of not less than Twenty-Five Thousand Dollars ($25,000.00) for injury or death of one person and not less than One Hundred Thousand Dollars ($100,000.00) for any one accident resulting in injury and/or death of four or more persons. Such insurance shall indemnify the State of Alabama as an additional assured as its interest may appear. Contractor agrees to provide a surety bond in the amount of Five Thousand Dollars ($5,000.00) to indemnify the State against loss for failure to pay to the State all sums of money which Contractor is obligated to pay under this agreement. The said surety bond and a copy of the aforesaid liability policy must be attached to the State's copy of this contract upon final execution thereof.

"22. CONSIDERATION, PAYMENT OF FEES TO STATE. As part of the consideration for this lease, Contractor has paid to the State simultaneously with the execution hereof the sum of Twenty-Five Thousand Dollars ($25,000.00).

"Contractor further agrees and binds itself to pay to State, as rental for the premises, the sum of money equivalent to two per cent (2%) of the gross income realized by the Contractor from revenue producing facilities, businesses, activities and buildings or other improvements located and/or operated on the premises, until such time as the State has received from Contractor at said rate of two per cent (2%) the total amount of Twenty-Five Thousand Dollars ($25,-

'000.00) ; thereafter, Contractor shall pay to the State as rental for said premises the sum of money equivalent to four per cent (4%) of said gross income. Contractor agrees to remit any amount due to the State in monthly installments on or before the 20th day of each month, the first of such installments to be due at the end of the first full calendar month occurring after the date of execution hereof. The monthly installments above stipulated shall be based on the gross income of the next immediately preceding month. 'Gross income,' as referred to in this instrument shall include all monies received for rent, fees, admissions, sub-leases or services; but in the sales of tangible merchandise the term "gross income' shall be deemed to include only the amounts by which the sale prices exceed the actual cost of the merchandise sold. Further, the percentage payments to the State shall be figured on gross income after first excluding therefrom any monies received in the form of sales or excise taxes or ad valorem taxes and all privilege licenses or fees payable to the State of Alabama or Baldwin County shall be first deducted as an expense of doing business. Such privilege taxes shall include but not be limited to those levied on the sales or privilege of selling alcoholic beverages, tobacco and gasoline.

"IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals on this the 4th day of September, 1956.

"STATE OF ALA-
BAMA
"Department of
Conservation

"By /s/ W. H.
Drinkard (Bill)
"W. H. DRINK-
ARD (BILL),
Director

"By /s/ James L.
Segrest
"JAMES L. SE-
GREST, Chief

"APPROVED:

"/s/ James E. Fol-
som
"GOVERNOR OF
ALABAMA

"ATTEST:

"/s/ Mary Texas
Hurt Garner
"SECRETARY OF
STATE

"THE TRI-STATE
CORPORATION,
INC.

"By /s/ J. H. Bar-
oco
"J. H. BAROCO,
Its President

"ATTEST:

"/s/ George Tra-
wick
"GEORGE TRA-
WICK, Its Sec-
retary"

APPENDIX "B"

"STATE OF ALABAMA ⎫   AMENDMENT
"BALDWIN COUNTY ⎬   TO LEASE
  ⎭   AGREEMENT

"KNOW ALL MEN BY THESE PRESENTS, That Whereas, the State of Alabama, acting by and through the Director of Conservation and the Chief of the Division of State Parks, Monuments and Historical Sites, as Party of the First Part, and the Tri-State Corporation, Inc., an Alabama Corporation, as Party of the Second Part, entered into a lease agreement on the 4th day of September, 1956, and

"WHEREAS, it is the desire of the Parties to this lease agreement that the original lease agreement be amended by changing paragraphs number One (1), Twelve (12) and Seventeen (17).

"NOW THEREFORE, BE IT MUTUALLY UNDERSTOOD AND AGREED by the Parties 'hereto that paragraph number One (1) of the orig-

inal lease agreement be amended so as to read as follows:

"1. GRANT OF LEASE. The State does hereby grant, lease and let unto the Contractor the following described real property situated in Baldwin County, Alabama, to-wit:

"PARCEL A. That part of Gulf State Park which is located within Section 10, Township 9 South, Range 4 East, less and except that portion of said Section 10 which lies south of the paved road running east and west through Gulf State Park, and west of the dividing line between SW ¼ of SE ¼ and SE ¼ of SE ¼ of said Section 10; also, that part of Gulf State Park which is located and situated easterly of the east shore-line of Big Lake within the east half of Section 15, Township 9 South, Range 4 East; also, that part of Gulf State Park which is located and situated within the east half of Section 22, Township 9 South, Range 4 East; also, that part of Gulf State Park which is located and situated within Sections 11, 14 and 23, Township 9 South, Range 4 East; also, that part of Gulf State Park which is located and situated within the west half of Sections 12 and 13, Township 9 South, Range 4 East; also, that part of Gulf State Park which is located and situated within the East Half of Sections 12 and 13, Township 9 South, Range 4 East; also, that part of Gulf State Park which is located and situated within Section 7, Township 9 South, Range 4 East.

"PARCEL B. That part of Gulf State Park described as beginning at the half-mile post on the west line of Section 8, Township 9 South, Range 4 East, and run thence south along said west line of said Section 8 to the point where the south line of Gulf State Park intersects said west section line and run thence east along said south line of Gulf State Park and along an eastwardly extension of said south line to the point where such extension of said south line intersects the north shore of Cotton Bayou at the line of mean low water, and run thence with the meanders of the north shore of Cotton Bayou eastwardly along the said line of mean low water to the point where said line of mean low water is intersected by the east line of Gulf State Park, thence run north along said east line of Gulf State Park to a point lying due east of the half-mile post on the east line of Section 8, Township 9 South, Range 4 East, thence run west to said half-mile post and continue thence west to the point of beginning.

"All of the aforementioned and described real property being a part of what is known as Gulf State Park in Township 9 South, Range 4 East, Baldwin County, Alabama, subject to any existing rights of way of streets, roads, and utility lines or facilities; together with any improvements presently thereon or which may be constructed or erected thereon during the term of this lease.

"BE IT FURTHER MUTUALLY UNDERSTOOD AND AGREED by the Parties to this lease agreement that paragraph number Twelve (12) of the original lease agreement be amended so as to read as follows:

"12. INSTALLATIONS BY CONTRACTOR AND STATE. The Contractor shall have the right to construct and maintain structures, fixtures, equipment and revenue producing facilities in accordance with the Master Plan which has been approved by the Parties hereto. Such structures which are constructed by Contractor, its agents, sub-contractors or sub-lessees shall be and become the property of the State upon completion thereof, subject, however, to sub-lessee's right to occupancy during the sub-lease term and further subject to the provisions of paragraph 4 hereof relating to rights of sub-lessees. Contractor, with the written approval of the State first having been obtained, shall have the

right to erect or construct additional facilities upon the premises. Contractor shall pay to the State Four Per Cent (4%) of the gross revenue received from such additional facilities which Contractor places or constructs upon the premises.

"All fixtures and equipment which are not of a permanent nature which are placed upon the premises by the Contractor, its agents, sub-contractors or sub-lessees may be removed from the premises by the Contractor, its agents, sub-contractors or sub-lessees, within sixty (60) days after the date of cancellation or termination of this contract; provided, the amount of fees which are due the State by Contractor, up to and including the date of termination, shall have been paid in full on the date of cancellation or termination or which shall be paid upon demand by the State before removal of any such fixture or equipment. All fixtures and equipment not of a permanent nature which are allowed to remain upon the premises for a period longer than sixty (60) days after the date of cancellation or termination of this contract shall be and become the property of the State and may be sold or disposed of in any manner deemed by the State to be advisable.

"The State may provide the premises with additional structures, equipment or facilities upon the written approval of the Contractor. The gross revenue derived from any additional facilities provided by the State shall be divided equally between Contractor and State. Payment to the State of its part of the revenue derived from such additional facilities shall be made at the same time and in the same manner as is provided for the regular payment of revenue to the State under the terms of this contract. It is agreed between the parties hereto that inasmuch as the leased premises is the property of the State, the improvements which are constructed upon the premises are not subject to ad valorem taxes. In the event such ad valorem taxes are, at some future time assessable, such taxes shall be paid by Contractor and deducted from the rentals which Contractor pays to the State under the terms of this agreement.

"BE IT FURTHER MUTUALLY UNDERSTOOD AND AGREED by the Parties hereto that paragraph number Seventeen (17) of the original lease agreement be amended so as to read as follows:

"17. SANITATION. Contractor agrees to keep the premises, including all buildings erected thereon, in a reasonably clean and sanitary condition at all times, and at its own expense, Contractor shall obtain such help and labor as may be necessary to accomplish that end. Should the Contractor fail to keep the premises in a reasonably clean and sanitary condition as specified herein, the State may notify the Contractor in writing of such failure, and should the Contractor fail substantially to correct or rectify the objectionable condition within ten (10) days from the date of receipt of such written notice from the State, then the State may, at its option, correct such conditions, or cause the same to be corrected, and the Contractor shall be obligated to pay all reasonable costs incurred by the State in taking such corrective action. It is agreed between the parties hereto that a portion of the leased premises will be used as a garbage disposal dump. The area so designated for such use shall be specified upon the Master Plan in accordance with paragraph Five (5) of the original lease agreement. Both parties hereto shall be permitted to use the area for garbage disposal, and by mutual consent they may allow a county or municipal government to use same. It is understood, however, that any use of the said garbage dump shall be in strict compliance with State and County laws and regulations which pertain thereto.

"BE IT FURTHER MUTUALLY UNDERSTOOD AND AGREED by the Parties hereto that this amendment shall be attached to the original agreement and become a part thereof just as if fully set out therein.

"IN WITNESS WHEREOF the Parties hereto have hereunto set their hands and seals on this the 19th day of March, 1957.

STATE OF ALABAMA
Department of
"RECOMMENDED: Conservation
(Party of the First Part)

"/s/ James L. Seg- /s/ W. H. Drink-
rest ard (Bill)

"JAMES L. SEG- W. H. DRINK-
REST, Chief Di- ARD, (BILL)
vision of State Director of Conser-
Parks vation

THE TRI-STATE
CORPORATION
"ATTEST: INC.
(Party of the Second Part)

"/s/ George Traw- /s/ J. H. Baroco
ick J. H. BAROCO
"GEORGE TRAY- Its President
WICK
"Its Secretary

"APPROVED:

"/s/ James E. Folsom
"GOVERNOR OF
ALABAMA

"ATTEST:

"/s/ Mary Texas
Hurt Garner
"SECRETARY OF
STATE"

APPENDIX "C"
"ORDER ON PRETRIAL HEARING

"This cause coming on to be heard on a regular pretrial hearing, and all parties being present in person or by counsel, the following action was thereupon taken:

"1. The following pleadings and amendments were allowed:

"Complaint as amended and the amended answer of the defendants The Tri-State Corporation, Inc., an Alabama Corporation, George Trawick, The First Bank & Trust Company of Pensacola, Florida, and the United States of America. The defendants William C. Younger as Director of the Department of Conservation of the State of Alabama, John Patterson as Governor of the State of Alabama, and Laurence H. Marks as Chief of the Division of State Parks, etc., do not actively oppose the efforts of the plaintiff, as hereinafter outlined, to secure cancellation of the lease in question.

"2. It was agreed by all the parties that the following are all of the issues in controversy in this cause:

"The State of Alabama, through its Attorney General, seeks to have this Court declare void a certain lease entered into on September 4, 1956, by and between certain of the then officials of the State of Alabama and the defendant The Tri-State Corporation, and approved January 28, 1957, wherein the State of Alabama leased to Tri-State approximately 2,740 acres of land located along the coastal area in Baldwin County, Alabama. The plaintiff contends that the compensation provided for in the lease is inadequate to the extent that it is a fraud on the State of Alabama, that the consideration provided for or that can be expected under the provisions of said lease is grossly inadequate, that said action of leasing the premises constitutes gross abuse of discretion on the part of the public officials and a breach of trust on the part of said officials, and that said conduct operated and continues to operate against the public interest. The State of Alabama further contends that the lease agreement as amended is void and illegal on its face in that it violates certain of the laws and the Constitution of the State of Alabama; these laws and constitutional provisions are: Sections 22, 93, 99, 100, 103, 211, 217, and 221, Constitution of Alabama.

"The State of Alabama, in seeking cancellation of the lease for the foregoing reasons, pursuant to a stipulation filed herein on April 19, 1962 and supplemented on the same date, offers to do equity in the event said contract is cancelled insofar as the United States and the Pensacola Bank are concerned. The State of Alabama further, in the event said lease is cancelled, offers to do equity insofar as any improvements or expenditures are concerned on the part of The Tri-State Corporation and its lessee, George Trawick; the matter of any equitable interest on the part of Tri-State or Trawick, in the event the lease is cancelled, to be determined by the Court.

"The defendants contend that, considering all the facts and circumstances surrounding the execution of the lease, it was not void nor voidable by reason of fraud, inadequate consideration, or abuse of discretion, or any of the other grounds contended by the State. To this extent, these defendants plead the general issue.

"The defendants further contend that if the provisions of the lease are to be construed so as to provide for a diminution or reduction in rent in the event of a sublease, then such provision is the result of a mutual mistake of fact by the parties and the lease should be reformed so as to eliminate the provisions resulting in such construction. The defendants further contend that if the Court does declare the lease to be invalid the defendants are entitled to restitution for their reasonable expenditures in and about the improvement of the leased premises and that such restitution shall be a condition for cancellation of the lease. The defendants also contend that the State in the present case is estopped from questioning the validity of the lease by reason of the delay in raising the question and the large expenditures incurred by the defendants during the period of such delay.

"As to the request for affirmative relief made by Tri-State and Trawick to the extent that they claim restitution for improvements, the State of Alabama controverts said claim by saying that as to whether or not said defendants are entitled to restitution depends upon the equities in this case.

"The plaintiff and the defendants Tri-State and Trawick are required to furnish each other on or before August 1, 1962, the name and address of each expert witness they are to call and use on the trial of this case.

"It is ORDERED that this cause be and the same is hereby set for trial to commence Monday, August 20, 1962, at 10 a. m., on the issues as herein set out.

"It is further ORDERED by the Court that all of the above-named allowances and agreements be and the same are hereby binding upon all parties in the above-styled cause, unless this order be hereafter modified by order of the Court.

APPENDIX "D"

"STIPULATION

"This stipulation entered into in this cause between the State of Alabama, on the relation of MacDonald Gallion, as Attorney General of the State of Alabama; William C. Younger, individually and as Director of the Department of Conservation of the State of Alabama; Laurence H. Marks, Individually and as Chief of the Division of State Parks, Monuments and Historical Sites of the Department of Conservation of the State of Alabama; and approved by John Patterson, Individually and as Governor of the State of Alabama, on the one part, and The First Bank & Trust Company of Pensacola, Florida and The United States of America, on the other part,

"WITNESSETH:

"1. That the parties agree that The First Bank & Trust Company of Pensacola, Florida, did on to-wit: March 1, 1958 lend to George Trawick the sum of Eighty Thousand and no/100 ($80,000.-00) Dollars, which sum of money was used in and for the payment of the cost of certain buildings, improvements and fixtures, situated on the following described

real property in Baldwin County, Alabama, to-wit:

"The West 600 feet of the SE–¼ of the SW–¼ of Section 14, T9S, R4E, between Ala. Hwy. No. 182 and Middle Lake; The East 300 feet of the West 600 feet of the SE–¼ of the SW–¼ of Sec. 14, T9S, R4E, lying South of Ala. Hwy. No. 182; and the East 300 feet of the West 600 feet of the fractional NE–¼ of the NW–¼ of Sec. 23, T9S, R4E, lying South of Alabama Hwy. No. 182.

That of said sum of $80,000 loan above referred to, The First Bank & Trust Company of Pensacola, Florida assigned 90% of said indebtedness to the United States of America acting by and through the Small Business Administration, an agency of the United States of America, but retained a participation interest of 10% in said indebtedness. Therefore, in substance and effect the United States of America, acting by and through the Small Business Administration loaned $72,000 and The First Bank & Trust Company of Pensacola, Florida loaned $8,000;

"2. That as security for said loan the said George Trawick by instrument recorded in the office of the Judge of Probate of Baldwin County, Alabama, in Book 298 at page 455, et seq., pledged, assigned, mortgaged and hypothecated that certain lease dated November 15, 1957 recorded in the office of the Judge of Probate of Baldwin County, Alabama, in Book 265, page 546, et seq., between Tri-State Corporation, Inc., as Lessor, and George Trawick, as Lessee, and the said Trawick also mortgaged all buildings and improvements then existing or thereafter erected on the said real estate hereinabove described.

"3. That neither the United States of America, acting by and through its Small Business Administration, an agency of the United States of America, or the First Bank & Trust Company of Pensacola, Florida, had any knowledge, actual or constructive, that that certain lease between the State of Alabama and Tri-State Corporation, Inc. was void or invalid, as to the parties thereto, if in fact, said lease is finally adjudicated in this proceeding to be void or invalid as to the parties thereto.

"4. That in its Bill of Complaint the State of Alabama has offered to do equity.

"5. That in the event that certain lease from the State of Alabama to Tri-State Corporation, Inc., dated September 14, 1956, as amended March 19, 1957, which is attached to and incorporated in said Bill of Complaint as Exhibits "A" and "B", is subsequently and finally adjudicated in this proceeding to be void or invalid between the parties thereto, then and in such event it would be unfair, unjust and inequitable for the State of Alabama to retain the valuable improvements and benefits arising and existing as the result of said loan above referred to, without making restitution and placing the said Bank and the United States of America, in the position that they were in before the making of said loan by which said valuable improvements were constructed on said real estate.

"6. That the State of Alabama asserts that it is prohibited by its Constitution from voluntarily stipulating or agreeing to pay any sum of money to the United States of America or its Small Business Administration or to the First Bank & Trust Company of Pensacola, Florida, or either of them, as a result of this transaction, if that certain lease between the State of Alabama and the Tri-State Corporation, Inc., is adjudged by the Court to be void or invalid as to the parties thereto, but it understands and agrees that it has offered to do equity in said cause, and that the State of Alabama and the proper officials thereof may be ordered to do equity by the Court, and would be bound to obey such order of the Court.

"7. That if said lease between the State of Alabama and the Tri-State Cor-

poration, Inc., is finally adjudicated to be void or invalid as to the parties thereto, it would be fair, just and equitable under all the facts and circumstances involved in the said loan transaction, and pertinent to this proceeding that the State of Alabama and the proper officials thereof be ordered by the Court (under the provisions of Title 8, Section 263, Code of Alabama, or in such manner and upon such conditions as the Court direct, prescribe or adjudge under its inherent equity jurisdiction) to convey in fee simple to the Small Business Administration, its successors and assigns, for its use and benefit and the use and benefit of the First Bank & Trust Company of Pensacola, Florida, the real estate hereinabove described, together with all buildings and improvements thereon situated; provided, and on condition nevertheless, that all of said described property be resold at its then market value by the Small Business Administration, its successors or assigns, within a period of time not exceeding two (2) years after the final disposition of said cause and a final adjudication that the said lease between the State of Alabama and Tri-State Corporation, Inc. is void or invalid as to the parties thereto, and the time for appeal therefrom has expired; provided further that from the proceeds of such resale the United States of America shall be reimbursed the sum then due it under the original note signed by George Trawick on to-wit: March 1, 1958, plus interest at the rate of five (5%) per cent per annum, and shall pay the First Bank & Trust Company of Pensacola, Florida, the sum then due it under its participation agreement, plus interest from March 1, 1958, at the rate of five (5%) per cent per annum; that after deduction of the foregoing, together with any expenses in connection with the resale and conveyance of said property or the making of the same in a condition to be sold, including but not limited to any reasonable recent repairs or maintenance, real estate commissions, broker's fees and other expenses incurred in connection with said resale, the balance and residue thereof shall be paid over to the State of Alabama or the proper officials thereof; and, it being further understood that in the event there is a deficiency in the net proceeds of such resale as aforesaid, that the State of Alabama shall not be liable or responsible to satisfy said deficiency.

"IN WITNESS WHEREOF, the parties hereto have set their hands this 19 day of April, 1962 at Montgomery, Alabama.

"MacDONALD GALLION, As Attorney General

"By /s/ Richard C. Belser

"Special Assistant Attorney General

"/s/ John Patterson

"John Patterson, Governor

"/s/ William C. Younger

"William C. Younger, Director of Conservation

"LAURANCE H. MARKS, Chief of the Division of State Parks, Monuments and Historical Sites of the Department of Conservation

"By /s/ William G. O'Rear

"Assistant Attorney General

*  *  *

"THE FIRST BANK & TRUST COMPANY OF PENSACOLA, FLORIDA

"By /s/ William A. Oldacre

"As Its Attorney

"THE UNITED STATES OF AMERICA

"By /s/ Hartwell Davis"

APPENDIX "E"

"SUPPLEMENTAL STIPULATION

"This Supplemental stipulation entered into in this cause between all the parties to the original stipulation.

768

"WITNESSETH:

"That said stipulation does not constitute a waiver, admission or modification of any of the positions, assertions or contentions of any party thereto; that said stipulation does not affect or prejudice the equitable or legal right, title or interest of George Trawick or of Tri-State Corporation, Inc. in and to the real estate involved in said cause or the buildings, improvements and fixtures thereon situated; that said stipulation is not in its tenor or effect directly or indirectly intended to restrict or limit the exercise of discretion by the Court, in adjudicating the right, title or interest, legal and equitable, of George Trawick or Tri-State Corporation, Inc. in and to the real estate involved in said cause, or the buildings, improvements and fixtures thereon situated, or to any other matters, facts or circumstances referred to therein.

"IN WITNESS WHEREOF, the parties hereto have set their hands this 19 day of April, 1962 at Montgomery, Alabama.

"MacDONALD GALLION, As Attorney General; JOHN PATTERSON, Governor; WILLIAM C. YOUNGER, Director of Conservation; and LAURENCE H. MARKS, Chief of the Division of State Parks, Monuments and Historical Sites of the Department of Conservation

"By /s/ Richard C. Belser

"Special Assistant Attorney General

\* \* \*

"THE FIRST BANK & TRUST COMPANY OF PENSACOLA, FLORIDA

"By /s/ William A. Oldacre

"As Its Attorney

"THE UNITED STATES OF AMERICA

"By /s/ Hartwell Davis"